No. 3680

Second Circuit

---

## BROADUS v. THE OHIO OIL COMPANY

(November 18, 1929. Opinion and Decree.)
(March 10, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

---

Julius T. Long, of Shreveport, attorney for plaintiff, appellee.

R. L. Benoit, of Shreveport, attorney for defendant, appellant.

REYNOLDS, J. This is a suit under the Workmen's Compensation Law (Act No. 20 of 1914 as amended).

Plaintiff alleged that while at work for defendant on November 5, 1928, digging ditches at a weekly wage of $31.50, the shovel with which he was digging slipped and the handle of it struck his left leg' in the vicinity of the knee and so injured the leg that he had permanently lost the use or function of it in consequence.

He further alleges that he was paid compensation of $20 a week for three weeks and that thereafter defendant refused to recognize liability for further payments.

And he prayed for judgment against defendant for $20 a week, beginning November 5, 1928, with legal interest on each payment from its maturity until paid, less a credit of $60.

Defendant admitted plaintiff's employment at a wage of $31.50 a week, but denied that he sustained any injury while in its employ and denied that plaintiff was disabled to any extent, and alleged that any injury plaintiff had sustained had long since healed and any disability resulting therefrom had long since ceased.

Defendant further alleged that on November 7, 1928, plaintiff reported to its foreman that he had sustained an injury while at work for defendant, and that on the faith of such representations defendant paid plaintiff compensation of $20 a week during three weeks and also provided him with physician's services and medicines, and learning that the injury complained of by plaintiff had not been received by him while in its employ it discontinued furnishing him with physician's services and medicines and discontinued paying him compensation.

On these issues the case was tried and there was judgment in favor of plaintiff and against defendant for $20 a week during his disability, not exceeding one hundred and seventy-five weeks, the first payment being decreed due as of November 5, 1928, with legal interest on each installment from its maturity until paid, less a credit of $60, and fixing the fees of the experts, Sanderson and Ragan, called by plaintiff as witnesses, at $25 each, and the fees of plaintiff's attorney at one-fifth of the net amount awarded.

From this judgment the defendant has appealed.

## OPINION

Plaintiff testified, regarding the manner in which he was injured and the nature of his injury:

"Q. Well, tell the court just how it happened?

"A. Well, I was digging a ditch, and I struck my foot down on the sharp-shooter, and had on a pair of rubber boots, and' I throwed my weight against it, it was muddy, and it just slipped off, and the end of it come down and hit me on the knee.

"Q. You mean the end of the sharp-shooter?

"A. Yes, sir.

"Q. You mean the shoulder?

"A. Yes, sir. And it hit me and it hurt me so bad, and it hurt me all down my leg, in my veins, and swelled up in my groins here to where I couldn't go.

"Q. Was there anything the matter with your knee before that time?

"A. No, sir."

The case was re-opened twice on the application of defendant, and on the third trial one of its witnesses, L. J. Brown, testified:

That on November 6, 1928, the day plaintiff alleges he was injured, he was hunting, and:

"Q. Did you see Mr. Broadus that day?

"A. Yes, sir.

"Q. Tell us what occurred?

"A. I was down there hunting and was sitting down under the tree, hunting for—looking for—and I heard some one holler and I went walking on down there and I found Mr. Broadus down there under a log, and I lifted the log off of him.

"Q. Did you lift the log off of him?

"A. Yes, sir.

"Q. Was he on the ground?

"A. Yes, sir.

"Q. Was that a pretty big log?

"A. No.

"Q. But you did lift it off of him?

"A. Yes, sir.

"Q. He could not get up without your lifting the log off of him?

"A. No, sir. He was down and I had to lift it off of him, and he got up and went toward the road, and I hunted on out and he was trying to see if he could get a ride to town, and he was taken in by Mr. Martin. He came along there and picked him up.

"Q. As he walked away from you, where you had taken the log off of his leg, did he limp?

"A. Yes.

"Q. What size log was that?

"A. I took it to be eleven or twelve inches in diameter.

"Q. How long was it?

"A. It was a short log.

"Q. What?

"A. It was a dead log.

*   *   *

"Q. Did you see him after that day?

"A. Yes, sir.

"Q. You say that was on the 6th of November?

"A. Yes, sir.

"Q. How do you fix that date?

"A. The reason I know it so well, it was my birthday; no one forgets that.

*   *   *

"Q. About what time of day was that?

"A. Between three, three thirty or four; somewhere along that.

*   *   *

"Q. Now you had not told any one about seeing the log on his leg?

"A. No, sir; I did not want to have anything to do with it.

*   *   *

"Q. You knew this case was going on?

"A. Yes, sir.

*   *   *

"Q. When did they ask you about it?

"A. Yesterday afternoon.

*   *   *

"Q. Then how come them to find out about the log having been on his leg?

"A. I do not know how come they to find it out.

"Q. What did they say that made you tell them that?

"A. I figured like it was that it was right and I would tell it.

"Q. How was it broached; let the court have some idea how it came up.

"A. They asked me if I knew anything about it and I told them that I did not want to have anything to do with it.

"Q. Then what?

"A. Then they said, 'it is all right to tell the truth,' and I says 'yes,' and after that happened I up and told them what I knew.

*   *   *

"Q. Will you tell the court about what time it was, without giving yourself too much latitude, when you pulled the log off of his leg?

"A. Three thirty or four thirty.

"Q. Was he hollering?

"A. Was hollering once in a while.

"Q. How far were you from him when you heard him?

"A. About a quarter.

*   *   *

"Q. Did you see him get in the car with the woman?

"A. No, sir; I heard the car stop and start up.

"Q. You did not see it?

"A. Yes, sir; seen the car close to the bridge.

"Q. Do you know whose car it was?

"A. I taken it to be Mr. Martin's car."

Mrs. E. G. Martin testified:

"Q. Do you know Mr. Broadus?

"A. Yes, sir.

"Q. Mrs. Martin, did you see him on November 6th last?

"A. I saw him that evening—that night you might call it.

"Q. Tell what happened?

"A. Well, I had gone across the Bodcaw and was on my way back home and over-taken him on the bridge; I saw that he was crippled, so I stopped and asked him if he wanted a ride, and he says yes he would sure appreciate a ride home. I had the car pretty well loaded, but he·hung on the fender, and we took him to town.

"Q. Did he have any squirrels with him?

"A. Yes, sir; eight.

"Q. How do you fix that date, Mrs. Martin?

"A. What makes me know it was on the 6th of November, I· know that a bill was charged to me; have two little nieces; the Cook baby was sick and I went to get some syrup, and got some cane juice, and we got some medicine, and the Keller child was sick, and the man could not tell me and my sister apart, and he charged the bill to me.

"Q. Did the doctor give you a prescription that day?

"A. It was charged at the drug store.

"Q. Did you see the prescription?

"A. Yes, sir; went in to pay my bill, and he marked it 'Martin baby Cook' in-stead of 'baby Cook.'

"Q. Would you recognize that prescription if you were to see it?

"A. Yes, sir; I certainly would.

"Q. I. will ask you if this is the prescription you are talking about? (Showing witness document.)·

"A. Yes, sir; there is part of the 'M'.·

\*　　\*　　\*

"Q. Did he say anything about ·being hurt?

"A. Well, he said something about be-ing hurt. I was driving and did not pay much attention. He was talking about getting hurt someway that evening.

\*　　\*　　\*

"Q. What time of day was that, Mrs. Martin?

"A. It was after dark; I had my lights on.

\*　　\*　　\*

"Q. You heard this young fellow Brown swear that you picked him up at four thir-ty in the afternoon?

"A. I was not paying him any mind.

"Q. He ·must be wrong? About that time? You did not pick him up at that time?

"A. It was after dark when I picked him up."

Mrs. Clara Martin testified:

"Q. Did you have occasion to see Mr. Broadus during the early part of Novem-ber?

"A. Yes, sir.

"Q. This past November?

"A. Yes, sir.

"Q. Will you tell us what took place, please?

"A. I was with my sister-in-law, Mrs. E. G. Martin, and he was coming across the Bodcaw bridge. She picked him up in her car and brought him in. I was in the car with her when she picked him up.

"Q. Did you see him before you picked him up?

"A. Yes, sir; he was walking on the Bodcaw bridge when she picked him up.

"Q. Did anything appear to be the mat-ter with him?

"A. He was limping pretty badly.

"Q. Do you know what date that was?

"A. On the 6th of November.

"Q. How do you fix that date?

"A. Well, two days after that, Mrs. Cox's little girl was sick. We had gone to see Mrs. Cox and she had the doctor with her and he had given a prescription show-ing that it was the 8th.

"Q. Was that the same day that you picked Mr. Broadus up, the day that the doctor gave the prescription?

"A. No, sir; it was two days after that that they had Dr. McKellar.

"Q. They had the doctor two days after your sister picked Mr. Broadus up?

"A. Yes, sir.

"Q. On what date did Mrs. Cox have the doctor?

"A. The 8th of November."

The testimony of the last two named witnesses contradicts that of the witness Brown· as to the time of the day plaintiff was in the woods,· and tends to discredit his testimony as to seeing Mrs. Martin's car near the Bodcaw bridge.

Defendant introduced ·the testimony of sixteen witnesses in the effort to prove that plaintiff had stated that his knee was hurt by a log rolling on it while he was in the woods hunting game and also to prove that at the time of the trial he

was able to do work of a reasonable character.

The testimony of these witnesses as to plaintiff's ability to do work of a reasonable character does not impress us in view of the testimony of the medical experts, the report of the radiologist, and the admission of defendant's counsel found in the record.

In the course of the trial the following colloquy took place between the court and defendant's counsel:

"By the court: If there is no dispute about whether the man was injured, we can probably curtail the expense as well as the length of the record.

"Mr. Benoit (counsel for defendant): So far as I am concerned, there will be no dispute that he has an injury to the knee; that is, so far as the injury is concerned. As I say, our answer does not set that forth, but we determined that after we filed an answer, and we didn't consider it necessary to file a supplemental answer, but just to make an admission, and we don't propose to contest the fact that he has an injury to his knee. Now, if Mr. Long (counsel for plaintiff) wants to prove the extent of it, he can proceed, but we are not contesting that fact."

In view of this admission of counsel for defendant we do not deem it necessary to consider the evidence as to whether or not plaintiff was injured or the nature and extent of his injuries or whether at the time of the trial he was unable to do work of a reasonable character in consequence of his injuries, and shall confine ourselves to the issue as to whether or not plaintiff was injured in the course of his employment by defendant and whether his disability at the time of the trial was the result of such injuries.

Disregarding entirely the testimony of plaintiff himself as to when and how he was injured, we find ample testimony in the record to show that it happened in the course of his employment by defendant.

Grady Nelson testified that he and plaintiff were at work together on the same job on November 5, 1928, and:

"Q. State whether or not an accident happened there to him at that time, and if so, what?

"A. Yes, sir. While I was working there, why—so I was coming on down the hill and stopped and rolled me a cigarette and he went to start in to work then and he shoved down on the sharp-shooter and his foot slipped or struck a root or something and struck his knee on the shoulder of the sharp-shooter and he stopped and commenced rubbing, and he says: 'That sure does hurt.' I says: 'May be it will quit directly' or something like that. I was just going walking on, and I says 'I had better go on up the line' and he stayed around there and rubbed his knee a while, and directly he came on up and stacked his tools, and the last I saw of him he was going in home from being hurt.

\*   \*   \*

"Q. What is a sharp-shooter?

"A. It is a little, narrow spade, six inches wide and sixteen inches long.

"Q. Well, how was it that he got hurt?

"A. Well, he was digging a ditch. He had his foot upon there, and he had done stopped digging, and I reckon got in a hurry or something, and thought he had better hurry up before the pusher saw him; so he shoved down on it, and struck a root and his foot slipped off and he wrenched over and he hurt his knee.

\*   \*   \*

"Q. What time in the morning was that?

"A. Between eight and nine o'clock.

"Q. Did he leave the job right away after that happened?

"A. Well, no. About fifteen or twenty minutes—something like that. I went on up the line and went to work, and when I saw him again he had stacked his tools, and I heard him tell the pusher who had charge of the crew his leg was hurting so he could not work."

C. V. Modisette testified that he witnessed the injury to plaintiff, and:

"Q. Tell the court what you know about it?

"A. \*   \*   \* Broadus had on a pair of gum boots, and he shovels with his left

foot, and he stepped on that shoulder of that sharp-shooter, and that gum boot slipped off and he hit his knee in there somewhere. He just craned over and craned down with it and he began to rub his knee, and I walked on then * * * just across a little drain on the next hill, and Broadus came on over there—wasn't over fifteen minutes from that time the boot slipped off that he comes over there and asked me where the pusher was, and I said 'sitting right on top of the hill over there' and he says 'boy, I am hurt and I got to go in' and he goes on up to Taylor and talks to Taylor a few minutes and he comes on back by me going in home —he said he was going in.

"Q. What time of the morning was that?

"A. About nine o'clock.

"Q. When did you see him next after he went home?

"A. I seen him that night about 6:30.

"Q. What was he doing when you saw him?

"A. Lying in bed.

"Q. Did you see him doing anything to his knee?

"A. I seen him bathing it in salty water."

Mrs. Emma Roberson testified that she resided within a hundred feet of plaintiff's home and saw him and her husband go off together to work on the morning of November 5, 1928, and saw plaintiff return home crippled between eleven and twelve o'clock the same day. That he was not crippled when he left that morning, and that on his return home he went to bed and remained there. That plaintiff's wife was sick and she, Mrs. Roberson, had occasion to visit her that day and the next and in that way saw plaintiff at home in bed on both days. She fixes November the 5th as the day she saw plaintiff come home crippled and go to bed by the fact that on that day she telephoned to the Baptist Hospital at Alexandria, Louisiana, for accommodations for a Mrs. J. P. Donohoe.

Another neighbor of plaintiff's, Mrs. Annie Persinger, testified that she went to see his wife on November 6th and found plaintiff in bed. That she arrived at plaintiff's house about 9 o'clock in the morning and remained there a couple of hours and that when she left he was still in bed.

Plaintiff admitted going squirrel hunting but denied that a log rolled on his leg and denied that he had even seen defendant's witness, Brown. He was asked:

"Q. You went hunting after you put in your claim?

"A. Certainly did.

"Q. She (meaning Mrs. Martin) did actually pick you up?

"A. She did; and I gave her two squirrels, and she didn't deny it. I gave her two squirrels."

He further testified that it was not on November 8th but on November 10th that Mrs. Martin picked him up.

"Q. Did you ever hurt your leg over in the woods?

"A. No, sir; I did not.

"Q. After you got hurt?

"A. No, sir; never."

We are satisfied that it was not on the 6th but on the 10th of November that plaintiff went hunting and was picked up by Mrs. Martin at the Bodcaw bridge. It being conceded that plaintiff was injured in the course of his employment and that he was not capable, at the time of the trial, of performing work of a reasonable character, the burden of proof was on defendant to show that the disability was not the result of the injury, and this burden the defendant failed to discharge.

The trial judge, who heard the witnesses testify and observed their demeanor on the witness stand, rendered judgment in favor of the plaintiff. Under the evidence and the law we think the judgment is right and it is affirmed.